DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**STATE OF FLORIDA,**
Appellant,

v.

**LARRY THOMAS LEIBY,**
Appellee.

No. 4D2024-2490

[November 5, 2025]

Appeal of a nonfinal order from the County Court for the Seventeenth Judicial Circuit, Broward County; Kenneth A. Gottlieb, Judge; L.T. Case No. 23-009412-MU-10A.

James Uthmeier, Attorney General, Tallahassee, and A. Colleen Donald, Assistant Attorney General, West Palm Beach, for appellant.

Joshua D. Rydell of The Law Offices of Joshua D. Rydell, Fort Lauderdale, for appellee.

CONNER, J.

The state appeals the trial court's order granting the defendant's motion to suppress. The state argues the trial court did not properly apply the law enforcement community care doctrine to the facts of the case. We agree and reverse.

*Background*

After being charged with driving under the influence and resisting an officer without violence, the defendant moved to suppress any evidence obtained following an alleged unlawful stop.

At the suppression hearing, the initial responding road patrol officer testified that on the evening of the defendant's arrest, the officer had responded to a dispatch call. The defendant's daughter had called 911 to report that her father left the house drunk and took her two younger siblings in the vehicle with him. The daughter reported that she was tracking her father using cellphone or some other tracking technology.

When the 911 call was made, the daughter's phone number appeared on a computer screen at the police department. The responding officer obtained the daughter's number and called her. The daughter repeated to the officer what she had told the 911 dispatcher. Because the daughter was still tracking the defendant, the officer learned that the defendant was at a McDonald's restaurant. The daughter described the defendant's vehicle and provided the license plate number.

The officer spotted the vehicle in the restaurant's drive-thru lane but could not see the license plate. Once the vehicle cleared the drive-thru, the officer confirmed the license plate number and initiated a traffic stop by getting behind the vehicle and activating his patrol car lights. The vehicle pulled into a parking spot. The officer blocked the vehicle from leaving by parking behind it. Until the officer walked up to the vehicle, he had been unable to see any children.

The officer testified that he had stopped the vehicle: based upon the daughter's report that the defendant was driving drunk with young children; to ensure the children's wellbeing; and to conduct a welfare check for the individuals in the vehicle.

The McDonald's restaurant was part of or adjacent to a gas station. As the officer walked toward the defendant's vehicle, someone at the gas station yelled to the officer that a young child was walking around in the restaurant's drive-thru lane. The officer testified he was initially worried about the two young children reported to be in the defendant's vehicle, so the officer proceeded to approach the vehicle, rather than check on the child in the drive-thru lane. As the officer approached, he saw a young girl in the backseat. The officer did not see any other child in the vehicle. Other officers arrived at that time.

On cross-examination, the officer testified that he had not observed the defendant commit any traffic infraction, and instead had made the stop for a welfare check. The only reason the officer had pulled the vehicle over was because of the information relayed by dispatch and the defendant's daughter. The officer again confirmed his primary reason for stopping the defendant's vehicle was to conduct a welfare check.

On redirect examination, when specifically asked the reason for blocking the defendant's vehicle, the officer testified the reason was to conduct a welfare check on the defendant's children.

In closing, defense counsel argued that the defendant was detained and not free to leave as soon as the initial officer parked behind the defendant's

vehicle, resulting in an illegal seizure of the defendant without reasonable suspicion or probable cause to believe the defendant was committing or committed a crime. Defense counsel disagreed the officer's actions were a lawful welfare check. Instead, defense counsel argued, what was reported to 911 and the officer was a crime—someone driving drunk with children in the vehicle. Thus, in stopping the defendant, the officer was investigating a crime.

The state responded that the officer had conducted a permissible stop for a welfare check, which falls outside of the Fourth Amendment's scope under the community caretaking doctrine. The state argued the defendant was not searched or seized to investigate a DUI when the officer approached the defendant's vehicle. Instead, the state argued, the officer's purpose was to check on the children's welfare. In support, the state cited *State v. Brumelow*, 289 So. 3d 955 (Fla. 1st DCA 2019).

Defense counsel acknowledged that if a citizen called 911 to report a drunk driver, law enforcement could legally stop the purported drunk driver to investigate; but without more, the officers could not seize the defendant. Defense counsel argued that in this case, stopping the defendant may have been proper based on the 911 call, but seizing the defendant by blocking his vehicle was improper because the only information which the officer had at that point was the information relayed in the 911 call and by the defendant's daughter, with no visual observation of improper driving or sensory indication that the defendant was drunk.

After reviewing *Brumelow*, the trial count announced its preliminary findings of fact. First, the trial court found the testifying officer was very credible and not impeached. Next, the trial court stated it believed the officer's testimony about conducting a welfare check when he stopped the defendant. The trial court acknowledged that welfare checks are "outside the Fourth Amendment." The trial court then commented that based on *Brumelow*, it was inclined to deny the suppression motion. However, the trial court indicated its concern about defense counsel's argument that blocking the defendant's vehicle was improper police activity in conducting a welfare check. The trial court also indicated its concerned about defense counsel's argument that law enforcement cannot use a welfare check as a cover for its actions when it is a crime that is reported. The trial court commented that neither side had argued whether the officer could have included the defendant as one of the persons whose welfare was being checked.

At the hearing's conclusion, the trial court reserved ruling and gave both sides the opportunity to provide the court with caselaw authority for their arguments. Both sides later filed supplemental authority.

The trial court granted the motion to suppress by written order stating:

> Defense Motion to Suppress is hereby granted for the reasons stated on the record in open court and after further review, there was no bad driving pattern and the community caretaking was for the children not the Defendant. Accordingly, the deputies [sic] actions constituting a welfare check is not supported by competent, substantial evidence. I believe based on the totality of the circumstances this was an improper search and seizure.

Following the trial court's written order granting suppression, the state gave notice of appeal.

*Appellate Analysis*

The state argues the trial court reversibly erred when it misapplied the community care doctrine and granted the suppression motion. Below, the defendant argued that while stopping his vehicle may have been proper as a welfare check on young children, the encounter had escalated into an unlawful investigatory stop and seizure when the officer blocked the defendant's ability to leave the encounter by parking his patrol vehicle behind the defendant's vehicle with law enforcement lights activated.

The defendant responds the state is using the community care doctrine as a veiled attempt to hide that the initial officer was investigating a crime because a crime is what the 911 caller had reported. The defendant also argues the state did not present any evidence to indicate a life-threatening emergency was occurring or a welfare check was needed.

We reject the defendant's argument that no evidence supported a welfare check. Thus, the appellate issue which we must resolve is the argument which the defendant made below: whether the officer using his vehicle to block the defendant's vehicle from leaving the McDonald's parking lot constituted an illegal seizure of the defendant under the Fourth Amendment.

"We review orders on motions to suppress to determine whether the trial court's factual findings are supported by competent substantial evidence and review legal issues de novo." *Gentles v. State*, 50 So. 3d

1192, 1196 (Fla. 4th DCA 2010) (citations omitted). "When considering a motion to suppress, a court is required to consider the 'totality of [the] circumstances' that led to the discovery of evidence." *Id.* (citations omitted). The trial court's ruling on the suppression motion is clothed with a presumption of correctness. *Id.* (citation omitted). Thus, the appellate court must interpret the evidence, reasonable inferences, and deductions in a manner most favorable to sustaining the trial court's ruling. *Id.* (citation omitted).

"The Florida Supreme Court has recognized three levels of police-citizen encounters: consensual encounters, investigatory detentions, and formal arrests." *Majors v. State*, 70 So. 3d 655, 659 (Fla. 1st DCA 2011) (citing *Popple v. State*, 626 So. 2d 185, 185 (Fla. 1993)). Resolution of this appeal involves consideration of the first two levels of police-citizen encounters.

A consensual encounter involves minimal police contact during which a citizen may either voluntarily comply with a police officer's requests or choose to ignore the requests. *Popple*, 626 So. 2d at 186. "Because the citizen is free to leave during a consensual encounter, constitutional safeguards are not invoked." *Id.* (citing *United States v. Mendenhall*, 446 U.S. 544 (1980)).

In the context of a criminal investigation, "an investigatory stop requires a well-founded, articulable suspicion of criminal activity. Mere suspicion is not enough to support a stop." *Id.* (citation omitted).

Nonetheless, our caselaw recognizes the Fourth Amendment allows a temporary detention "based on an officer's discharge of his 'community caretaking' duties." *Gentles*, 50 So. 3d at 1198; *Castella v. State*, 959 So. 2d 1285, 1292 (Fla. 4th DCA 2007). "Thus, even without reasonable suspicion of criminal activity, <u>a police officer may detain an individual pursuant to a community caretaking function under certain circumstances</u>." *Gentles*, 50 So. 3d at 1199 (emphasis added) (citation omitted). Community caretaking encounters "ha[ve] been deemed a reasonable and prudent exercise of an officer's duty to protect the safety of citizens." *Id.* (citing *Lightbourne v. State*, 438 So. 2d 380, 388 (Fla. 1983)).

In discussing permissible law enforcement actions under the community caretaking doctrine, we opined in *Castella*:

> The community caretaking doctrine addresses those law enforcement functions that are "totally divorced from the detection, investigation, or acquisition of evidence relating to

5

the violation of a criminal statute." *Cady v. Dombrowski*, 413 U.S. 433, 441, 93 S. Ct. 2523, 37 L. Ed. 2d 706 (1973). Instead, searches and seizures under the community caretaking doctrine focus on "concern for the safety of the general public." *Id.* at 447, 93 S.Ct. 2523. In addition to automobile searches, <u>the doctrine also encompasses the seizure of individuals "'in order to ensure the safety of the public and/or the individual, regardless of any suspected criminal activity.'"</u> *Samuelson v. City of New Ulm*, 455 F.3d 871, 877 (8th Cir. 2006) (citation omitted). Such a seizure is reasonable if it is based on specific articulable facts and a reviewing court determines that the balance between law enforcement's interest in protecting public safety and the individual's interest in being free from arbitrary governmental interference favors seizure. *Id.* Overall, <u>under the community caretaking doctrine, law enforcement "may make warrantless searches and seizures in circumstances in which they reasonably believe that their action is required to deal with a life-threatening emergency</u>." *Russoli v. Salisbury Township*, 126 F. Supp. 2d 821, 846 (E.D. Pa. 2000).

959 So. 2d at 1292 (emphasis added).

Under the umbrella of the community caretaking doctrine, the caselaw has often employed the term "welfare check" to describe situations constituting an exception to the Fourth Amendment's warrant requirement that allows police officers to engage in a seizure or search of a person or property solely for safety reasons. *See Brumelow*, 289 So. 3d at 956) ("Welfare checks fall under the so-called 'community caretaking doctrine,' which is a judicial creation that carves out an exception to the Fourth Amendment's warrant requirement by allowing police officers to engage in a seizure or search of a person or property solely for safety reasons.").

Welfare checks pursuant to the community caretaking doctrine permit law enforcement actions that might otherwise violate the Fourth Amendment. *Taylor v. State*, 326 So. 3d 115, 117 (Fla. 1st DCA 2021). "Because searches and seizures conducted in connection with welfare checks are 'solely for safety reasons,' the scope of an encounter associated with a welfare check is limited to prevent the exception from becoming an investigative tool that circumvents the Fourth Amendment." *Id.* at 118 (citing *Brumelow*, 289 So. 3d at 956). In other words, "[t]he purpose of a welfare check regulates its scope." *Id.* (citations omitted). Thus, "[w]ithout

6

any reasonable suspicion that criminal activity is or was afoot, the welfare check should end when the need for it ends." *Id.* (citations omitted).

Importantly, a welfare check is not limited to checking on one person. *See Brumelow*, 289 So. 3d at 957 (holding a welfare check applied to two occupants in a vehicle). That is because the community caretaking doctrine is applicable to the community at large. *See Castella*, 959 So. 2d at 1292 ("[S]earches and seizures under the community caretaking doctrine focus on 'concern for the safety of the general public.'" (citation omitted)). Thus, in *Brumelow*, the case upon which the state relied at the suppression hearing, the First District determined that a welfare check's legitimacy had to be evaluated separately as to two occupants whom law enforcement had encountered after responding to a 911 call. 289 So. 3d at 957. The 911 caller had reported that two occupants in a parked vehicle with the motor running appeared to be asleep or unconscious. *Id.*

Courts must keep in mind that "[t]he touchstone of any Fourth Amendment analysis—including one involving a welfare check—is reasonableness, which is measured by the totality of existing circumstances." *Taylor*, 326 So. 3d at 118 (citations omitted). "Both the scope and manner of a welfare check must be reasonable." *Id.* (citation omitted). Although law enforcement is not required to use the least intrusive methods available when performing community caretaking functions, a welfare check that evolves into a seizure "must be commensurate with the perceived exigency at hand." *Id.* (citations omitted).

The United States Supreme Court has opined that "[o]ne exigency obviating the requirement of a warrant is the need to assist persons who are seriously injured or <u>threatened with such injury</u>. The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency.'" *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006) (emphasis added) (citation omitted). *Brigham City* is instructive for our analysis. There, the respondents argued the warrantless entry into the home was unreasonable because "the officers were more interested in making arrests than quelling violence." *Id.* at 404. The Court rejected that argument because "[a]n action is 'reasonable' under the Fourth Amendment, regardless of the individual officer's state of mind, 'as long as the circumstances, viewed objectively, justify [the] action.'" *Id.* (citation omitted). Additionally, the Court held: "The officer's subjective motivation is irrelevant." *Id.* (citations omitted). More importantly, the Court held, "the issue is not [the officer's] state of mind, but the objective effect of his actions." *Id.* (citations omitted). The Court ultimately upheld the warrantless entry because "the officers

had an objectively reasonable basis for believing both that the injured adult might need help and that the violence in the kitchen was just beginning." *Id.* at 406.

We also note that multiple Florida cases have discussed the community care doctrine or welfare checks involving facts where the harm investigated may have been intertwined with a crime. For example, in *Daniels v. State*, 346 So. 3d 705 (Fla. 2d DCA 2022), a citizen called 911 to report that Daniels was asleep in his truck with lights on. *Id.* at 707. "[T]he truck was parked in a business parking lot but was situated within the entrance/exit and facing outwards as if Daniels was preparing to pull out onto the adjacent road." *Id.* Two deputies responding to the call summoned an emergency medical squad (EMS) to see if Daniels was experiencing a health issue. The officers also called for a DUI officer. *Id.* After EMS cleared Daniels as not experiencing a health issue, the DUI officer began his investigation, resulting in charges against Daniels. *Id.*

In analyzing the state's welfare check justification for seizing Daniels, the Second District noted that when "the first law enforcement officers arrived, there were only three possible explanations for the way in which Daniels and his truck were found: (1) a medical incident occurred, (2) <u>he was under the influence of something</u>, or (3) he was really tired and had pulled into the parking lot to sleep." *Id.* at 710 (emphasis added). Although Daniels had contended at the suppression hearing that he had parked to sleep, the Second District determined Daniels' positioning of his vehicle made his explanation very implausible. *Id.* The court reasoned:

> The two most plausible reasons for the location of the truck and the manner in which both the truck and Daniels were found were not mutually exclusive. Both could exist at the same time. The fact that one of the possible reasons had been dispelled before [the DUI deputy] arrived (i.e., that Daniels had had some sort of medical incident) does not mean that reasonable suspicion did not exist. Rather, it merely strengthened the only other *reasonable* possibility: that Daniels was under the influence of something.
>
> <u>We conclude that even if the known facts involved potentially lawful or innocent conduct, they did, at the very least, result in an ambiguous situation under the totality of the circumstances. Thus the officers were permitted to detain him to resolve any ambiguities</u>.

8

*Id.* (emphasis added). Based on the above reasoning concerning an ambiguous situation, the Second District affirmed the trial court's denial of the motion to suppress. *Id.*

The caselaw regarding reasonable suspicion for investigatory detentions requires the reviewing court to consider the totality of the circumstances from the "standpoint of an objectively reasonable police officer." *Daniels*, 346 So. 3d at 709 (citations omitted). That is because "'[i]nnocent behavior will frequently provide the basis' for reasonable suspicion." *Id.* (citation omitted). For that reason, as noted in *Daniels*, "officers may detain individuals to resolve ambiguities about suspicious yet lawful or innocent behavior[.]" *Id.* (emphasis added) (citation omitted).

Applying the legal principles discussed above to this case, we begin by observing that the trial court's finding of the officer being truthful in his reason for stopping and blocking the defendant—to conduct a welfare check of the children—is irrelevant. Instead, the question is: under the totality of the circumstances, would an objectively reasonable law enforcement officer, with knowledge of (1) the facts as relayed by the 911 caller and the defendant's daughter, and (2) his observation of the defendant's vehicle, have stopped and blocked the defendant's vehicle to ensure that the officer could confirm the children were not in harm's way?

A reality of everyday life is that minor children generally are under their parent's control. Another reality of everyday life is that young children generally will follow their parent's instruction, even if the parent is drunk. Yet another reality of everyday life is that children generally are unable to fend for themselves.

No doubt exists that a drunk driver with children in the vehicle exposes the children to significant risk of severe harm or death. The average citizen with knowledge that a drunk driver has children in a vehicle has little opportunity to stop the vehicle. The average citizen in such cases calls 911 to report the concerns. A law enforcement officer has the best ability to stop the vehicle and prevent danger to the children. In this case, the defendant did not dispute below that the officer had a right to stop his vehicle based on the information which the officer had received from the 911 caller to check the children's welfare.

We also determine it was not unreasonable for the officer to block the defendant's vehicle to ensure the defendant would not drive away before the officer could accurately and completely determine the children were safe. As stated in *Taylor*, law enforcement is not required to use the least intrusive methods available when performing community caretaking

9

functions. 326 So. 3d at 118. Even though the stop in this case evolved into a seizure, the seizure was reasonably commensurate with the perceived exigency at hand. We conclude the facts demonstrate the officer was attempting to protect young children, who cannot fend for themselves, from an objectively reasonable assumption that the children were in grave risk of being severely injured by a drunk driver. Thus, blocking the defendant's vehicle was not impermissibly intrusive to the defendant's Fourth Amendment right to be free from temporary detention in the context of a welfare check.

The officer's testimony, which the trial court found credible, and which included the details of the daughter's 911 call, constituted competent, substantial evidence supporting the officer's welfare check of the children. Although the trial court's reasoning for denial in the written order is not entirely clear, we agree with the state that the information which the officer had at the time of the stop justified a welfare check of the children under the community care doctrine. On the unique facts of this case involving young children and a potential drunk driver, stopping and blocking the defendant's vehicle to check the children's welfare was justified without the necessity of viewing impaired driving.

We therefore hold, based on the facts as developed in the record, that the trial court erred in granting the motion to suppress.[1]

*Conclusion*

Having determined the trial court erred in granting the defendant's suppression motion, we reverse the order granting the suppression motion, and remand for entry of an order denying the motion to suppress, along with further proceedings.

*Reversed and remanded for further proceedings.*

GROSS and MAY, JJ., concur.

---

[1] The defendant argued on appeal that the evidence did not support a welfare check because the state had called only one witness at the suppression hearing but did not admit the 911 call or present any other evidence. For that reason, we echo the same caution stated by then Chief Judge Morris's concurring opinion in *Daniels*: "[T]he [s]tate would be wise to submit the strongest evidence possible to justify the [community caretaking] detention. Otherwise[,] the [s]tate risks having a conviction overturned [or evidence suppressed]." 346 So. 3d at 711 (Morris, C.J., concurring).

10

\*          \*          \*

*Not final until disposition of timely-filed motion for rehearing.*